**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM SHEARS, | ) | CASE NO. 5:20-cv-02790 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| FIRSTENERGY CORP., *et al.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

This matter is before the Court upon Defendant Energy Harbor Nuclear Corporation's

(Defendant) Motion for Summary Judgment. (R. 29; R. 31-1). For the following reasons, the

Motion is granted.

## I. Procedure

Plaintiff William Shears's Complaint alleges multiple claims against his former employer

Defendant, as well as FirstEnergy Corporation, relating to his employment and termination. (R.

1). Specifically, Plaintiff alleges state and federal claims of disability and age discrimination,

failure to provide a reasonable accommodation for Plaintiff's disability, and retaliation for

Plaintiff's engagement in a protected activity. (*Id.*, PageID# 4–10 ¶¶ 20–60).

The Court dismissed FirstEnergy Corporation from this action pursuant to the parties'

stipulation. (R. 6; R. 12). After completing discovery, Defendant moved for Summary Judgment, requesting judgment as a matter of law on all of Plaintiff's claims. (R. 29; R. 31-1). Plaintiff filed an Opposition ad Defendant a Reply. (R. 39; R. 43).

## II. Facts[1]

### A. Background

Relevant to this action, Defendant owned and operated nuclear power plants, including the Perry Nuclear Power Plant (Perry Plant or Perry) in Ohio. (R. 29, PageID# 132). Plaintiff began working as a Junior Engineering Technician for Defendant in 1990 and continued working for Defendant in several different positions until his employment termination in May 2019. (R. 39, PageID# 403, 409; R. 39-5, Plaintiff's Ex. 10, PageID# 556).

While working as an engineer at the Perry Plant in 2012, Plaintiff was diagnosed with Type 2 diabetes, which he treated with medicine. (R. 29, PageID# 135; R. 40-3, Shears Depo., PageID# 921, 934). Plaintiff's diabetes affects, among other things, his eyesight, anxiety, cognitive skills, and decision-making abilities. (R. 40-3, Shears Depo., PageID# 923–924). At the time of his diagnosis, Plaintiff submitted a doctor's note to Defendant, which then accommodated Plaintiff's diabetic condition by not "mak[ing] [Plaintiff] work night shifts for long periods of time." (R. 40-3, PageID# 934).

In 2019, at the age of 58, Plaintiff worked at the Perry Plant as a Maintenance Supervisor in the Instrument and Controls (I&C) department, where he had been transferred in 2012. (R. 39, PageID# 402–403; R. 39-5, Plaintiff's Ex. 11, PageID# 557; R. 29, PageID# 134). During his time in the I&C department, Plaintiff typically worked during the day shift, though he did

---

[1] The following recitation of facts is undisputed unless otherwise indicated.

occasionally work the night shift. (R. 29, PageID# 133; R. 39, PageID# 406; R. 40-1, Beahon

Depo., PageID# 723).

The Perry Plant includes two separate working areas: the "protected" area and the

"unprotected" area. (R. 29, PageID# 134). Access to the protected area is restricted. For

employees to gain access, they must undergo a retinal scan and swipe their employee badge or

keycard, which records the times that employees enter and exit the area in a centralized

computer. (*Id.*; R. 40-1, Beahon Depo., PageID# 636, 638). There is no keycard requirement to

access the unprotected area of the facility, which includes the Administration building. The

Administration building houses the Perry Plant's engineering and Human Resources personnel.

(R. 40-1, Beahon Depo., PageID# 636).

All nuclear power plants, including the Perry Plant, undergo regular refueling outages,

during which the plants shut down for approximately twenty-five to thirty-five days so that their

fuel can be replaced and their equipment repaired. (R. 40-3, Shears Depo., PageID# 903; R. 40-1,

Beahon Depo., PageID# 614). When there is an outage, the Perry Plant's employees are required

to work more hours and different shifts than during non-outage periods. (R. 29, PageID# 133; R.

40-1, Beahon Depo., PageID# 614, 622–623). During an outage, Perry's supervisory employees,

including Plaintiff, receive overtime for the additional hours that they work, so they must record

their time in a computer program. (R. 29, PageID# 133–134; R. 40-1, Beahon Depo., PageID#

659; R. 40-3, PageID# 905). Plaintiff's superior, Jim Beahon, would then periodically review the

time entries and approve them. (R. 29, PageID# 134; R. 40-1, Beahon Depo., PageID# 656–657;

R. 40-3, Shears Depo., PageID# 905).

B. Plaintiff's Termination

The Perry Plant had a refueling outage beginning in the middle of March 2019 that

continued for approximately thirty days through the middle of April 2019. (R. 40-1, Beahon Depo., PageID# 617; R. 29, PageID# 133; R. 39, PageID# 406). During the outage, Plaintiff was required to work a twelve-hour shift, which was typically scheduled overnight from approximately 11:00 p.m. through 11:00 a.m. the following day. (R. 29, PageID# 133; R. 40-3, Shears Depo., PageID # 917).

Plaintiff testified that during the outage he had "[m]ore than a dozen" conversations with Beahon, who knew about Plaintiff's diabetes since before 2017, explaining that the night shift was causing his health to "fail[]" and that it was "killing" him. (R. 40-1, Beahon Depo., PageID# 691–692; R. 40-3, Shears Depo., PageID# 917–919). According to Plaintiff, he asked Beahon to place him on the day shift to accommodate his health concerns, but Beahon failed to honor his request. (R. 40-3, Shears Depo., PageID# 948). Although Beahon recalls that over the years, Plaintiff had told him that he disliked the night shift because of his diabetes, Beahon had interpreted Plaintiff's complaints about the night shift during the 2019 outage as a "general statement" that the night shift "affect[ed] [him]" due to his diabetes, not that it was specifically impacting his health, judgment or caused confusion. (R. 40-1, Beahon Depo., PageID# 723–725). Beahon remembers always telling Plaintiff that if his diabetes impacted Plaintiff's work, then Plaintiff should speak with his doctor and get a note so that Defendant could accommodate his medical condition. (R. 40-1, Beahon Depo., PageID# 696–697, 722–724). During the outage, Plaintiff also complained about the night shift to his coworkers, including Rick Wiles, Steve Hill, Jamie Platt, John Pantani, and Shawn Wittie. (R. 40-3, Shears Depo., PageID# 919; R. 29, PageID# 135).

After working on the night shift for approximately the first three weeks of the outage, Plaintiff submitted a doctor's note to Beahon dated April 3, 2019. (R. 40-3, Shears Depo.,

PageID# 946). The note requested that Defendant excuse Plaintiff from work between April 3, 2019, and April 7, 2019, and that upon his return, Plaintiff should only work the day shift for one month due to his "medical condition." (R. 40-6, Ex. D, PageID# 1181). Defendant immediately accommodated Plaintiff's request: Plaintiff did not work for the five days specified in the note, and as far as Plaintiff recalls, he did not work another night shift when he returned. (R. 40-3, Shears Depo., PageID# 943–945; R. 40-1, Beahon Depo., PageID# 729–730).

On or around April 22, Beahon reviewed Plaintiff's March 2019 timesheets, which included entries that Plaintiff made during the outage. (R. 40-1, Beahon Depo., PageID# 705; R. 39, PageID# 408). As Beahon testifies, since he understood that Plaintiff's responsibilities during the outage would have occurred entirely within the protected area, Beahon compared Plaintiff's time records with the times that Plaintiff entered and exited the protected area each day. (R. 40-1, Beahon Depo., PageID# 680–681, 688; R. 29, PageID# 136; R. 39, PageID# 408). When he noticed discrepancies between Plaintiff's recorded hours and his time in the protected area, Beahon prepared a spreadsheet listing these discrepancies, which is attached as Exhibit H to his Deposition Transcript. (R. 40-6, Ex. H, PageID# 1194; R. 40-1, Beahon Depo., PageID# 703). Ultimately, Beahon found that twenty-one out of twenty-six of Plaintiff's time entries contained an "inaccuracy."[2] (R. 40-6, Ex. H, PageID# 1194). Of these twenty-one inaccuracies, Plaintiff appeared to have overstated his time by more than thirty minutes in ten of the entries, and these ten overstatements ranged between 32 and 106 minutes each. (R. 40-6, Ex. H, PageID# 1194, R.

---

[2] At various points during his deposition, Beahon testifies that there were twenty inaccuracies on Plaintiff's March 2019 time entries (*see, e.g.*, R. 40-1, Beahon Depo., PageID# 688–689, 703), while other evidence in the record indicates that Beahon believed there were twenty-one inaccuracies (*see, e.g.*, R. 39-5, Plaintiff's Ex. 16, PageID# 588). The Court does not find this a material difference.

29, PageID# 136). Plaintiff also appeared to have understated his time in four entries, which discrepancies ranged between five and thirty-two minutes. (R. 40-1, Beahon Depo., PageID# 746–747; R. 40-6, Ex. H, PageID# 1194).

Beahon alerted then-Maintenance Manager Kevin Clark to the discrepancies, and Clark instructed Beahon to speak with Plaintiff for a "fact finding" investigation. (R. 39, PageID# 403, 409; R. 40-2, Clark Depo., PageID# 809, 812; R. 40-1, Beahon Depo., PageID# 688). On or around April 24, 2019, Beahon and Brian Sutter interviewed Plaintiff regarding the timesheet discrepancies. (R. 40-3, Shears Depo., PageID# 982; R. 39-5, Plaintiff's Ex. 19, PageID# 588). The parties appear to agree that Plaintiff denied wrongdoing during the interview, even though certain details of the conversation are in dispute. (R. 40-3, Shears Depo., PageID# 986; R. 39, PageID# 409; R. 29, PageID# 136). Additionally, when Beahon raised the issue of the inaccuracies, Plaintiff said that the timesheet errors may have been related to his medical condition. (R. 39, PageID# 409; R. 29, PageID# 136; R. 40-1, Beahon Depo., PageID# 689). The parties do not dispute that at one point during the conversation, Plaintiff offered to repay Defendant for the overstatements of his time if such discrepancies existed. (R. 40-3, Shears Depo., PageID# 989; R. 29, PageID# 136; R. 40-1, Beahon Depo., PageID# 689). Finally, Plaintiff and Beahon both testify that Plaintiff explained that the 1 hour and 45 minute overstatement of time on March 8, 2019, was the result of an honest mistake. (R. 40-3, Shears Depo., PageID# 987–988; R. 39-5, Plaintiff's Ex. 19, PageID# 588). After speaking with Plaintiff, Beahon also interviewed Rick Wiles, a peer employee to Plaintiff who helped schedule the outage and worked on the day shift. (R. 39, PageID# 409; R. 40-4, Wiles Depo., PageID# 1133; R. 40-1, Beahon Depo., PageID# 671). Wiles, however, did not notice the specific times that Plaintiff left the plant each day during the outage. (R. 39, PageID# 418; R. 39-5, PageID#

589).

After concluding the investigation, Beahon relayed to Clark that Plaintiff was not forthcoming during the interview regarding the discrepancies in his time entries, and recommended Plaintiff's termination. (R. 40-2, Clark Depo., PageID# 815–816, 829–830; R. 40-1, Beahon Depo., PageID# 738, 740; R. 39, PageID# 409). Beahon and Clark then began the process of meeting with the Safety Conscious Work Review Team (SCWRT), a group composed of senior employees at the Perry Plant, including the Human Resources Manager. (R. 40-1, Beahon Depo., PageID# 716, 738–740; R. 40-2, PageID# 809, 829–830). After multiple meetings with the SCWRT, Clark decided to terminate Plaintiff—for what he testifies was Plaintiff's intentional falsification of his timesheets and misrepresenting it—and the SCWRT concurred. (R. 40-1, Beahon Depo., PageID# 688, 709, 738–740; R. 40-2, PageID# 808–809, 829–830; R. 39, PageID# 409).

On the morning of May 8, 2019, Plaintiff met with Clark and Ruben Ordonez, the head of Human Resources, and Clark terminated Plaintiff's employment. (R. 40-3, Shears Depo., PageID# 888; R. 40-6, Ex. A, PageID# 1178; R. 40-1, Beahon Depo., PageID# 608). Later that evening, Plaintiff's doctor signed a note indicating that Plaintiff's blood sugar was "markedly out of control" for the two months prior to April 1, 2019, which would "affect [Plaintiff's] judgment and possibly cause confusion." (R. 40-6, Ex. C, PageID# 1180). The note was electronically signed at 6:22 p.m. on May 8, 2019; and, although the record is unclear, it appears the document was provided to Defendant at some later date. (*Id.*; R. 40-1, Beahon Depo., PageID# 717–718). What is clear, Plaintiff testified that he did not give the note to Clark or Ordonez during the May 8th meeting in which he was terminated. (R. 40-3, Shears Depo., PageID# 927). Beahon also did not receive the note prior to Plaintiff's termination. (R. 40-1, Beahon Depo., PageID# 717–718).

7

C. Previous Investigations

Between November 2018 and January 2019, Plaintiff assisted two employees in bringing complaints to Human Resources regarding allegations that two of Plaintiff's peers engaged in sexual harassment and created a hostile work environment. (R. 39, PageID# 405–406; R. 40-3, Shears Depo., PageID# 1038–1041). Plaintiff participated in Defendant's ensuing investigations of these claims. (R. 40-3, Shears Depo., PageID# 1041; R. 39, PageID# 405–406). The investigations resulted in one person receiving a three-day suspension and another a written reprimand. (R. 39-5, Plaintiff's Exs. 21–22, PageID# 593–594). The allegations also implicated Beahon's conduct. (R. 39, PageID# 405–406; R. 40-3, Shears Depo., PageID# 1038–1041). Beahon received coaching regarding a perceived favoritism toward one of the employees who brought the complaint to Human Resources. (R. 39-5, Plaintiff's Ex. 18, PageID# 587; R. 39, PageID# 405–406).

**III. Legal Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Quinn v. Eshem*, 2016 WL 9709498, at *2 (6th Cir. Dec. 20, 2016) ("Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (internal quotation marks omitted)). There is a genuine dispute as to a material fact when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Non-moving parties may not rest upon the mere allegations in their pleadings nor upon

general allegations that issues of fact may exist. *See Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974). Moreover, a party asserting an affirmative defense bears the burden of proof at trial as to the affirmative defense, and thus bears that burden at the summary judgment stage as well. *See, e.g.*, *Wells Fargo Bank, N.A. v. Favino*, 2011 WL 1256847, at *4 (N.D. Ohio Mar. 31, 2011) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion. *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990).

## IV. Analysis

### A. <u>Disability Claims</u>

Plaintiff first brings claims pursuant to the Americans with Disabilities Act (ADA) and the parallel Ohio statute alleging Defendant (i) failed to provide a reasonable accommodation for Plaintiff's disability and (ii) discriminated on the basis of Plaintiff's disability that ultimately led to his termination. (R. 1, PageID# 4–6 ¶¶ 20–35).

The ADA provides that "[n]o [employer] shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).

Similarly, Ohio Revised Code § 4112.02(A) provides that "[i]t shall be an unlawful discriminatory practice: For any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A).

According to the Sixth Circuit and the Ohio Supreme Court, the analysis of claims made pursuant to the ADA also applies to claims made under Ohio Revised Code § 4112.02. Therefore, disability claims brought under Ohio law may be evaluated concurrently and under the same standards as claims brought under the ADA. *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 367–68 (6th Cir. 2013) (*citing Jabukowski v. Christ Hosp., Inc.*, 627 F.2d 195, 201 (6th Cir. 2010)); *see also City Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998) ("The federal [ADA] is similar to the Ohio handicap discrimination law. . . . We can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law."). Therefore, the Court continues by examining the general analytical framework that applies to claims under the ADA.

To recover on a claim for discrimination under the ADA, a plaintiff must show that he "(1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated on other grounds*, *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019). A plaintiff can bring a disability discrimination claim using either direct or indirect evidence, but the type of evidence presented determines the analytical framework a court applies. *Denoewer v. Union Cty. Indus.*, 2020 WL 1244194, at *3 (S.D. Ohio Mar. 16, 2020) (*citing Ferrari*, 826 F.2d at 891).

Direct evidence is such evidence that, if accepted as true by the finder of fact, "no inference is necessary to conclude that the employee has proven" discrimination. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).

### 1. *Failure to Accommodate*

The direct evidence test applies when a plaintiff brings a claim for an employer's failure to accommodate the plaintiff's disability. *See Blanchet v. Charter Comms., LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022) (*citing Kleiber*, 485 F.3d at 868), *reh'g denied*, 2022 WL 1519183 (6th Cir. May 5, 2022). In direct evidence cases, the plaintiff bears the burden of showing that he "(1) has a disability, and (2) is otherwise qualified for the position, either (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kovac v. Sup. Dairy, Inc.*, 998 F. Supp. 2d 609, 619 (N.D. Ohio 2014) (*citing Kempter v. Mich. Bell Tel. Co.*, 534 F. App'x 487, 490 (6th Cir. 2013)). The employer, meanwhile, has the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that the proposed accommodation will impose an undue hardship upon the employer." *Kleiber*, 485 F.3d at 869 (*quoting Hendrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). Additionally, a plaintiff must establish that he "requested and was denied" a reasonable accommodation. *Kovac*, 998 F. Supp. 2d at 619 (*citing Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 786 (6th Cir. 2002)). An employer has no duty to provide a reasonable accommodation until a plaintiff requests one. *Id.* (*citing Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005)); *see also Coles v. Johnny Appleseed Broadcasting Co.*, 479 F. Supp. 3d 585, 597 (N.D. Ohio 2020).

Once a disabled employee requests an accommodation, an employer must "participate in good faith in the interactive process to attempt to identify an appropriate accommodation." *Bare*

*v. Fed. Exp. Corp.*, 886 F. Sup. 2d 600, 613 (N.D. Ohio 2012) (*citing Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004); *Shaver v. Wolske & Blue*, 742 N.E.2d 164, 170–71 (Ohio Ct. App. 2000)). Typically, if an employer has an established procedure for requesting an accommodation, an employee must "avail herself of that procedure." *Reeves v. Case W. Reserve Univ.*, 2009 WL 3242049, at *12 (N.D. Ohio Sept. 30, 2009).

Plaintiff contends that Defendant failed to accommodate his diabetes by refusing Plaintiff's requests to work the day shift, rather than the night shift, during the refueling outage that began in March 2019. (R. 1, PageID# 4–5 ¶ 25, 32; R. 39, PageID# 402). Plaintiff testifies that despite having "[m]ore than a dozen" conversations with his superior Beahon during the outage, as well as additional conversations prior to the outage, regarding his inability to work the night shift due to his diabetes, Beahon failed to remove Plaintiff from the night shift for approximately the first three weeks of the outage. (R. 40-3, Shears Depo., PageID# 917–920, 930; R. 39, PageID# 406). Beahon testifies that although Plaintiff "always complained" when he had to work that night shift, and that Plaintiff expressed to Beahon that the night shift "affect[ed]" him, Beahon did not interpret these conversations as Plaintiff telling him that the night shift exacerbated his medical condition. (R. 40-1, Beahon Depo., PageID# 692–693, 728; R. 29-1, Beahon Affidavit, PageID# 149 ¶ 8).

Viewing the evidence in the light most favorable to Plaintiff as the non-movant, while the Court may construe Plaintiff's conversations with Beahon as requesting an accommodation, there is no evidence that Plaintiff was ultimately denied that accommodation. Plaintiff's claim is undercut by the fact that Plaintiff submitted to Beahon a note from Plaintiff's medical provider dated April 3, 2019, asking to excuse Plaintiff from work from April 3, 2019, through April 7, 2019, and that upon his return, Plaintiff worked the day shift. (R. 40-6, Ex. D, PageID# 1181; R.

40-1, Beahon Depo., PageID# 728–729; R. 40-3, Shears Depo., PageID# 943–944). It is

undisputed that Defendant accommodated those requests: Plaintiff was given those five days off

from work, and as far as Plaintiff recalls, he did not work another night shift when he returned.

(R. 40-3, Shears Depo., PageID# 944–945; R. 40-1, Beahon Depo., PageID# 729–730). In short,

Defendant granted Plaintiff's accommodation request.

Plaintiff's reliance on *Downs v. AOL Time Warner, Inc.*, 2006 WL 162563 (S.D. Ohio

Jan. 20, 2006) is misplaced. (R. 39, PageID# 416). Unlike in the instant case, the plaintiff in

*Downs* submitted a doctor's note requesting that the plaintiff be removed from the night shift due

to his diabetes, and the defendant employer essentially ignored the request. *Downs*, 2006 WL

162563, at *11–12.

Insofar as Plaintiff argues that his claim is based on Defendant's failure to provide a

reasonable accommodation prior to April 3, 2019, it also fails. Plaintiff asserts that because

Defendant had previously provided Plaintiff with an accommodation—specifically, allowing

Plaintiff to work only the day shift—following his diabetes diagnosis in 2012, Defendant should

have provided a similar accommodation during the 2019 refueling outage. (R. 40-3, Shears

Depo., PageID# 934; R. 39, PageID# 407). This argument is unconvincing. First, the mere fact

that Plaintiff submitted a doctor's note with an accommodation request in 2012, and such request

was accommodated, put Plaintiff on notice that he should submit a doctor's note in the future if

he required an accommodation related to a medical condition. This is in line with Beahon's

uncontested testimony that Defendant's policy—as he explained to Plaintiff—was that Plaintiff

should submit a doctor's note if his diabetes became a concern and that Defendant would

accommodate that request. (R. 40-1, Beahon Depo., PageID# 696–697, 722–723). Here, relevant

to the 2019 outage work schedule, Plaintiff admits that he did not provide a doctor's note to

13

Defendant prior to the one dated April 3, 2019. (R. 40-3, Shears Depo., PageID# 945). Moreover, there is no evidence that Plaintiff renewed the 2012 accommodation request upon his transfer to the I&C department. (R. 43, PageID# 1216). Finally, the outage beginning in March 2019 was planned and scheduled two years in advance, affording Plaintiff ample opportunity to submit a doctor's note requesting an accommodation before the start of the outage, which he did not do. (R. 40-1, PageID# 671).

Because Plaintiff does not establish a genuine issue of material fact that Defendant denied Plaintiff a reasonable accommodation, the Court grants Defendant's Motion for Summary Judgment on Defendant's state and federal law claims alleging Defendant failed to provide Plaintiff a reasonable accommodation.

## 2. *Disability Discrimination*

Plaintiff's next claims that Defendant violated the ADA and Ohio Revised Code § 4112.02 by discriminating against him on the basis of his diabetes and terminating his employment.

When a plaintiff attempts to present indirect evidence of discrimination, as is the case here, the Court must apply the burden-shifting framework established in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ferrari*, 826 F.3d at 891–92. To prove disability discrimination under this framework, a plaintiff must first establish a prima facie case by showing: (i) he or she is disabled; (ii) he or she is otherwise qualified for the position, with or without reasonable accommodation; (iii) he or she suffered an adverse employment decision; (iv) the employer knew or had reason to know of the plaintiff's disability; and (v) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Id.* (*citing Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996),

*abrogated on other grounds*, *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (*en banc*)).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory explanation for its action. *Ferrari*, 826 F.3d at 892, 895 (*citing Monette*, 90 F.3d at 1186). If the defendant offers such a reason, the burden shifts back to the plaintiff, "who must introduce evidence showing that the proffered explanation is pretextual." *Ferrari*, 826 F.3d at 885 (internal quotation marks omitted) (*quoting Monette*, 90 F.3d at 1186).

a. <u>Prima Facie Case and Legitimate, Nondiscriminatory Reason</u>

Plaintiff has established a prima facie case of disability discrimination related to his termination, as Defendant does not dispute any of the factors required to make such a showing. Defendant does not challenge that Plaintiff has a disability. *See, e.g.*, *Downs v. AOL Time Warner, Inc.*, 2006 WL 162563, at *6–7 (S.D. Ohio Jan. 20, 2006) (holding that plaintiff presented genuine issues of material fact as to whether plaintiff's diabetes rendered him disabled for the purposes of the ADA). Given his employment history and satisfactory performance reviews while working for Defendant, Plaintiff was qualified for his position, with or without a reasonable accommodation. (*See, e.g.*, R. 39-5, Plaintiff's Ex. 12, PageID# 558–559 (rating Plaintiff as an "Effective" employee in his 2015 evaluation)). Plaintiff's employment was terminated, which is an adverse employment decision. (R. 40-6, Ex. A, PageID# 1178). Defendant, and Beahon specifically, knew about Plaintiff's diabetes for years prior to Plaintiff's termination, and Clark was aware when he made the decision to terminate Plaintiff that he had a medical condition. (R. 40-1, Beahon Depo., PageID# 691–692; R. 40-2, Clark Depo., PageID# 840). Finally, Defendant replaced Plaintiff with two other employees after his termination. (R. 40-4, Wiles Depo., PageID# 1143).

In response, Defendant offers a legitimate, nondiscriminatory reason for Plaintiff's termination—that Plaintiff intentionally falsified his March 2019 time records and initially denied that he did so. (R. 29, PageID# 136–137, 140). Specifically, Defendant alleges that twenty-one of the twenty-six time entries that Plaintiff recorded in March 2019 contained inaccuracies, and that ten of those twenty-one inaccuracies significantly overstated his work time by more than thirty minutes. (R. 29, PageID# 136). As a result, the burden shifts back to Plaintiff to show that this reason was pretextual.

### b. Pretext

An employee can show pretext in three ways: by offering evidence that the employer's proffered reasons (i) had no basis in fact, (ii) did not actually motivate the action, or (iii) were insufficient to motivate the action. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998). In challenging an employer's action, "an employee must demonstrate that the employer's reasons . . . are not true." *Smith*, 155 F. 3d at 805–06 (internal quotation marks omitted) (*quoting Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)).

Showing that an employer's proffered reason has no basis in fact "consists of evidence that the proffered bases for the plaintiff's discharge never happened." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*citing Anderson v. Baxter Healthcare*, 13 F.3d 1120, 1123–24 (6th Cir. 1994)), *overruled on other grounds*, *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009). Under this first method of showing pretext, "an employer benefits from a presumption about its honest belief, which can render an inference of pretext unwarranted." *Van Leer v. Univ. Contr. Co., LLC*, 2021 WL 2895532, at *7 (N.D. Ohio July 9, 2021) (*citing Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)).

Pursuant to the Sixth Circuit's "modified honest belief doctrine," for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer "must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Russell v. Univ. of Toledo*, 537 F.3d 596, 605 (6th Cir. 2008) (emphasis omitted) (internal quotation marks omitted) (*quoting Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)). The employee then has "the opportunity to introduce contrary evidence, but the decisional process need not be optimal, only reasonably informed and considered." *Id.* The key inquiry is "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Seeger*, 681 F.3d at 285–86 (*citing Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). If an employer can establish that it held an honest belief, the employee cannot establish pretext even if the employer's reason is ultimately found to be "mistaken, foolish, trivial, or baseless." *Seeger*, 681 F.3d at 285–86 (*quoting Smith*, 155 F.3d at 806). For the purposes of summary judgment, an employee's "bare assertion" that the employer's proffered reason is not based on fact does not create a genuine issue of material fact. *Sharp v. Waste Mgmt.*, 47 F. Supp. 3d 584, 603 (S.D. Ohio Sept. 16, 2014) (*citing Seeger*, 681 F.3d at 286).

For a plaintiff to establish pretext by showing that the employer's given reason did not actually motivate the plaintiff's termination, the plaintiff "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal." *Manzer*, 29 F.3d at 1084 (emphasis omitted). Under this method of proof, "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Id*. (emphasis omitted).

17

And for a plaintiff to establish pretext by showing that Defendant's proffered reason was insufficient to actually warrant his termination, the plaintiff must show by a preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge" of the plaintiff. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286–87 (6th Cir. 2012). The plaintiff must produce evidence that the employees who were not terminated engaged in "acts of comparable seriousness." *Id.* at 287.

The Court now examines in turn each of these three methods for establishing pretext.

i. *No Basis in Fact*

Plaintiff first argues that Defendant's accusation of timesheet falsification has no basis in fact because Defendant merely compared the amount of time that Plaintiff spent in the protected area each day—not the total number of hours he worked at the plant—with the hours he recorded on his timesheets in March 2019. Plaintiff contends that because he may have done some work outside of the protected area in March 2019 during the outage, the time entries he recorded may not have been overstated. (R. 39, PageID# 418–419). Although it is true that Defendant only had records of the time Plaintiff spent in the protected area, and no records of the amount of time Plaintiff worked in any other location at the Perry Plant facility on a given day, Beahon testifies that Plaintiff would have had no work responsibilities outside of the protected area during the refueling outage. (*Id.*; R. 40-1, Beahon Depo., PageID# 674–675, 680). And when Beahon questioned Plaintiff on April 24, 2019, regarding the apparent discrepancies on his timesheets, Plaintiff did not raise the possibility that he worked outside of the protected area during the outage. (R. 39-5, Plaintiff's Ex. 19, PageID# 588; R. 40-3, Shears Depo., PageID# 990; R. 40-1, Beahon Depo., PageID# 707). Even when Plaintiff testified for the purposes of this lawsuit, he

18

could not recall any specific moments during the outage when he worked outside of the protected area, except to say that he stopped by the Administration building "on occasion" to use the restroom or "look at a document." (R. 40-3, Shears Depo., PageID# 990–991). Plaintiff's argument relies on almost complete speculation about what he may have been doing during those working hours, as he is not able to provide any evidence of his whereabouts or his tasks outside of the protected area. Even more important, there is no evidence that Defendant would have been aware at the time of Plaintiff's termination that he may have worked outside of the protected area during the outage. Therefore, there is no evidence from which a reasonable trier of fact could conclude that when Defendant made its decision to terminate Plaintiff, it had any reason to believe that Plaintiff's inflated time records included work performed outside of the protected area during the March 2019 outage.

Second, Plaintiff contends that Defendant's reasoning for his termination is false because in addition to the overstatements on Plaintiff's March 2019 timesheets, there were four entries that understated the amount of time that he spent in the protected area. (R. 39, PageID# 419; R. 40-1, Beahon Depo., PageID# 746–747). In other words, according to Plaintiff, the overstatements on his timesheets are more consistent with an honest mistake than an intentional falsification of his records because he also made some errors that resulted in him being paid less on some days. Even though there were, in fact, four entries that understated the amount of time Plaintiff spent in the protected area, the magnitude of those errors pales in comparison to the overstatements of his time. Altogether, in March 2019, Plaintiff overstated the amount of time that he spent in the protected area by approximately ten hours, and understated his time by approximately one hour. (R. 40-6, Ex. H, PageID# 1194–1201). Even discounting the one hour and forty-five minute overstatement of time that Plaintiff admitted to and claimed was an honest

mistake (R. 40-6, Ex. H, PageID# 1194; R. 40-3, Shears Depo., PageID# 987–988), the other overstatements of Plaintiff's time far outweighed the entries understating Plaintiff's time. Simply put, the relatively insignificant understatements of Plaintiff's time do not alone rebut Defendant's honest belief that Plaintiff falsified his timesheets.

Third, Plaintiff asserts that he experienced confusion during the outage due to working the night shift with diabetes, and any errors that he may have made on the timesheets were out of his control. (R. 39, PageID# 419). However, even accepting as true that each of Plaintiff's timesheet errors resulted from alleged confusion due to his diabetes, Sixth Circuit law clearly establishes that Defendant would still be able to terminate Plaintiff for these errors because they were related to his job performance. *See Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) ("[A]n employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job." (citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999)), *abrogated on other grounds*, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (*en banc*); *see also Brohm v. JH Props., Inc.*, 149 F.3d 517, 522 (6th Cir. 1998); *Sper v. Judson Care Ctr., Inc.*, 29 F. Supp. 3d 1102, 1110 (S.D. Ohio 2014). Plaintiff unsuccessfully attempts to distinguish this line of precedent by citing to caselaw for the proposition that an employer may not terminate an employee for misconduct that results from a disability if the misconduct was caused by the employer's failure to accommodate the employee's disability. (R. 39, PageID# 422 (*citing McPherson v. Mich. High Sch. Ath. Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997))). As previously discussed, however, the record indicates that Defendant did not fail to reasonably accommodate Plaintiff's disability, so Plaintiff's caselaw is inapposite.

Fourth, Plaintiff believes that because he offered to repay Defendant for his

overstatements of time, his termination for the falsification of his timesheets was factually false. (R. 39, PageID# 419; R. 40-3, Shears Depo., PageID# 967). However, such an offer does not automatically mitigate Defendant's lack of trust in Plaintiff, which is part of the reason Defendant decided to terminate his employment. (R. 29, PageID# 137; R. 40-1, Beahon Depo., PageID# 687–688; R. 40-2, Clark Depo., PageID# 808–809).

Fifth, Plaintiff argues that one of Defendant's Human Resources representatives "conceded" that there was no evidence that Plaintiff falsified his timesheets. Plaintiff points to an April 29, 2019, email from Linda Griffith to Ruben Ordonez that states that Plaintiff's timesheet inaccuracies "could have been an honest mistake." (R. 39-5, Plaintiff's Ex. 25, PageID# 598; R. 39, PageID# 419). Reading this email in context, Defendant has not "conceded" a lack of evidence that Plaintiff intentionally falsified his timesheets. Rather, the email is from a Human Resources representative, who appears to have not been previously involved in the investigation, asking another member of Human Resources to ensure that somebody had talked to Plaintiff to get his "side of the story." (R. 39-5, Plaintiff's Ex. 25, PageID# 598). By the date Griffith sent this email, Beahon and Sutter had already interviewed Plaintiff.

Sixth, Plaintiff argues that Beahon's "shifting" testimony counsels a finding of pretext. Specifically, Plaintiff points to Beahon's deposition testimony stating that Plaintiff has "always over the years explained that he disliked nightshift, because of his diabetes" and that Plaintiff had told Beahon that the night shift was a "problem for him" because of his diabetes. (R. 40-1, Beahon Depo., PageID# 723–724). Plaintiff contests that this deposition testimony conflicts with the testimony in Beahon's affidavit attached to Defendant's Motion for Summary Judgment, which says that Plaintiff "said nothing to [Beahon] either before or during the outage that he was having any sort of medical issue related to being assigned to that shift." (R. 29-1, Beahon

21

Affidavit, PageID# 149 ¶ 8). However, Plaintiff omits a relevant portion of Beahon's deposition testimony explaining that he told Plaintiff that if the night shift became a problem, then Plaintiff should "get the note from the doctor and [Defendant would] accommodate." (R. 40-1, Beahon Depo., PageID# 723). With this context in mind, Beahon's affidavit testimony is not inconsistent with his deposition: Plaintiff expressing to Beahon his dislike for the night shift without alerting Beahon or Defendant to an actual medical concern caused by his working that shift.

Seventh, Plaintiff appears to argue that Defendant's investigation into the timesheet errors was generally insufficient. For example, Plaintiff suggests that during the fact-finding interview, Beahon did not show Plaintiff his March 2019 timesheets or other documentary evidence of the discrepancies. (R. 39, PageID# 418). Additionally, Plaintiff believes that Beahon should have conducted more interviews than just the ones that he had with Plaintiff and Wiles. (*Id.*). Even accepting Plaintiff's points as true, they still fail as a matter of law because the record demonstrates that Defendant performed a sufficient investigation to make a reasonably informed and considered decision to terminate Plaintiff. *See Seeger*, 681 F.3d at 285–86. Beahon's investigation included all the following steps: (i) cross-referencing Plaintiff's times in the protected area with his timesheets; (ii) putting together a spreadsheet to document and calculate the inaccurate time entries; (iii) interviewing Plaintiff regarding the timesheet discrepancies and giving Plaintiff the opportunity to offer an explanation; and (iv) escalating the issue to Clark, who convened meetings with the SCWRT to help him reach an ultimate decision to terminate Plaintiff. The investigation was sufficient to give Defendant an honest belief, at the time that it terminated Plaintiff's employment, that he had intentionally falsified his timesheets.

Eighth, and finally, to the extent that Plaintiff contends that Defendant's access to the doctor's note dated May 8, 2019, demonstrates pretext for Plaintiff's termination, the record

simply does not support such a conclusion. Although the doctor's note indicates that Plaintiff's diabetes may have caused him confusion (R. 40-6, Ex. C, PageID# 1180), there is no evidence in the record that anybody at Defendant received and reviewed this note before terminating Plaintiff's employment on the morning of May 8, 2019. On the face of the note, Plaintiff's doctor electronically signed the document at 6:22 p.m. on May 8, 2019, which was well after Defendant terminated Plaintiff's employment. As a result, the note could not have put Defendant on notice—before Plaintiff's termination—of the doctor's opinion that Plaintiff could have been confused during the outage timeframe because of his diabetes. Moreover, Plaintiff admits that he did not give the note to Clark or Ordonez during the termination meeting, and there is no evidence that Beahon read the note prior to Plaintiff's termination.[3] (R. 40-3, Shears Depo., PageID# 927 R. 40-1, Beahon Depo., PageID# 717–718).

For the foregoing reasons, the Court holds that Plaintiff has not introduced a genuine issue of material fact to rebut the presumption of Defendant's honest belief that Plaintiff had intentionally falsified his timesheets.

## ii. *Did Not Actually Motivate*

The closest that Plaintiff comes to admitting that the timesheet errors occurred but that

---

[3] In his brief, Plaintiff relies on one exchange in Beahon's deposition testimony in which Beahon answers in the affirmative to a question about whether he "had information during the time [he] was reviewing [Plaintiff's] timecards from a medical professional that [Plaintiff's] medical condition was such that it was impacting his judgment and decisionmaking." (R. 39, PageID# 408; R. 40-1, Beahon Depo., PageID# 700). Beahon's answer to this question is belied by the evidentiary record as a whole: as already discussed, Plaintiff only submitted two doctor's notes to Defendant. The note dated April 3, 2022, contains no information about Plaintiff's judgment or decisionmaking. (R. 40-6, Ex. D, PageID# 1181). And as already discussed, there is no evidence that Beahon or anybody else at Defendant received the note dated May 8, 2022, prior to Plaintiff's termination. *See supra*; (R. 40-6, Ex. C, PageID# 1180). Without more, the evidence cited by Plaintiff does not create a material issue of fact to preclude summary judgment.

his termination was not motivated by these errors is his contention that because Beahon did not typically prioritize his review of employees' timesheets and that he reviewed Plaintiff's time entries differently than he did other employees', that the investigation into Plaintiff's timesheets was pretextual. (R. 39, PageID# 419–420). In support of his argument, Plaintiff points to Beahon's testimony that Beahon was "regularly late with employee timesheet and reviews," even though he aimed to review the timesheets every two weeks. (*Id.*; R. 40-1, Beahon Depo., PageID# 657–658). However, according to this same testimony, when reviewing timesheets, Beahon would ordinarily compare an individuals' timesheets with his or her schedule to check for any "abnormalities." Then, he would follow up with the individuals if he found any. (R. 40-1, Beahon Depo., PageID# 658–659). This appears to be exactly how he reviewed Plaintiff's timesheets. As to Plaintiff's suspicions about the timing of Beahon's review of his timesheets, Beahon began examining Plaintiff's March 2019 time entries on or around April 22, 2019—that is, approximately three weeks after the end of the month whose time was being reviewed. (R. 39, PageID# 408; R. 40-1, Beahon Depo., PageID# 705). This timing appears to be in line with Beahon's typical timesheet review process.

For the foregoing reasons, the Court holds that Plaintiff has not established a genuine issue of material fact that Plaintiff's termination was not actually motivated by Plaintiff's timesheet errors.[4]

---

[4] Plaintiff also testifies that an employee at Defendant had told Plaintiff that Beahon had told the employee's boss that Plaintiff was a "cancer" to the I&C department. (R. 40-3, Shears Depo., PageID# 969; R. 39, PageID# 402). To the extent that Plaintiff argues that this comment demonstrates pretext, that argument fails since it is inadmissible hearsay. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("[H]earsay evidence cannot be considered on a motion for summary judgment.").

### iii. *Insufficient to Warrant Termination*

Plaintiff's argument that his timesheet errors were insufficient to warrant his termination has two components: (i) Plaintiff cites to Clark's deposition testimony to support the assertion that timesheet errors are not a terminable offense and that Defendant does not terminate employees for "honest mistakes"; and (ii) Plaintiff argues that even though other employees have made timesheet errors, nobody except Plaintiff has been terminated for doing so. (R. 39, PageID# 421). Both points are meritless.

First, Clark's testimony in no way indicates that Defendant has a policy of not terminating employees for making timesheet errors. When Clark was asked whether "a timesheet error alone" was insufficient to warrant termination, Clark answered, "Yeah. I mean, *it depends*, yes." (R. 40-2, Clark Depo., PageID# 835 (emphasis added)). Here, Plaintiff did not make one timesheet error, but rather several weeks' worth of timesheet errors that substantially overstated his work hours. Second, neither Beahon nor Clark believed that Plaintiff's errors were an "honest mistake," which was a significant reason why Defendant ultimately terminated Plaintiff. (R. 40-1, Beahon Depo., PageID# 687–688; R. 40-2, Clark Depo., PageID# 848).

Plaintiff also fails to provide evidence regarding the alleged timesheet errors of the other employees and how such errors compared to the inaccuracies on Plaintiff's timesheets. This is fatal to Plaintiff's argument because he fails to support a contention that these employees' errors were of the same magnitude as Plaintiff's. For instance, a hypothetical employee's single-day timesheet error is not equivalent to Plaintiff's many weeks of errors.[5]

---

[5] Plaintiff also argues that there must be pretext because Defendant gave two employees less severe punishments for their roles in sexual harassment and hostile work environment claims than the punishment Plaintiff received for falsifying his timesheets. (R. 39, PageID# 421). However, those claims are not sufficiently identical to Plaintiff's timesheet errors for the

In sum, Plaintiff has also not established a genuine issue of material fact that Defendant's legitimate, nondiscriminatory reason for his termination was pretext. As a result, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's state and federal law claims for disability discrimination.

### B. <u>Retaliation Claims</u>

Plaintiff next claims that he was unlawfully terminated—in violation of Title VII and Ohio Revised Code § 4112.02(I)—in retaliation for assisting employees in bringing complaints to Human Resources regarding sexual harassment and a hostile work environment. (R. 1, PageID# 6–8 ¶¶ 36–44). Plaintiff also claims that Defendant unlawfully retaliated against him for requesting a reasonable accommodation for his diabetes. (R. 1, PageID# 6–7 ¶ 37–39).

Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Similarly, Ohio Revised Code § 4112.02 makes it unlawful for "any person to discriminate in any manner against any other person because that person has opposed any unlawful discrimination practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." Ohio Rev. Code § 4112.02(I). And the ADA provides, "No

_____

purposes of establishing pretext under Sixth Circuit law. *See, e.g.*, *Blizzard*, 698 F.3d at 286–87 ("[Appellant] must show by a preponderance of the evidence that other employees, particularly employees not in the protected class, were not fired even though they were engaged in *substantially identical* conduct to that which the employer contends motivated its discharge of [appellant]." (emphasis added) (internal quotation marks omitted) (*quoting Manzer*, 29 F.3d at 1084)).

person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

Retaliation claims are "treated the same whether brought under the ADA or Title VII." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997); *see also Holt v. Olmstead Twp. Bd. of Trs.*, 43 F. Supp. 2d 812, 826 (N.D. Ohio 1998). A plaintiff's state law retaliation claim is also analyzed under the same law as an ADA retaliation claim. *Holt*, 43 F. Supp. 2d at 827. Moreover, because of the similar language of Ohio Revised Code § 4112.02(I) and Title VII, Ohio courts have held that "[f]ederal law provides the applicable analysis for reviewing retaliation claims" brought under Ohio Revised Code § 4112.02(I). *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (alteration in original) (*citing Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981)). As a result, the Court applies the same analysis to each of Plaintiff's retaliation claims under the ADA, Title VII, and Ohio Revised Code § 4112.01(I).

Like a disability discrimination claim, to establish a claim for retaliation, a plaintiff must first make out a prima facie case. To do so, a plaintiff must show that "(1) he engaged in protected activity, (2) the activity was known to the defendant, (3) plaintiff was subjected to materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action." *Harris v. Metro. Gov't of Nashville and Davidson Cty.*, 594 F.3d 476, 485 (6th Cir. 2010) (*citing Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001)). Once the plaintiff makes this showing, the defendant must articulate a legitimate, nonretaliatory reason

for its action before the burden shifts back to the plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation. *Harris*, 594 F.3d at 485 (*citing Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6ᵗʰ Cir. 2009)); *see also Braun*, 828 F.3d at 510–11 (*citing McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The analysis for showing pretext is the same as for a disability discrimination claim. *Harris*, 594 F.3d at 486.

The Court presumes, without deciding this issue, that Plaintiff has established a prima facie case of unlawful retaliation. However, the analysis for determining whether the intentional falsification of Plaintiff's timesheets was pretext for his termination is the same as the Court's previous discussion of Plaintiff's disability discrimination claim. *See supra*. Therefore, Plaintiff has failed to establish a genuine issue of material fact that Defendant's legitimate, nonretaliatory reason was pretextual, and the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's state and federal law claims for unlawful retaliation.

## C. Age Discrimination Claims

Last, Plaintiff claims that he was terminated due to age discrimination, in violation of the Age Discrimination in Employment Act (ADEA) and Ohio Revised Code § 4112.02(A). (R. 1, PageID# 8–10 ¶¶ 45–60).

The ADEA provides that "[i]t shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). Ohio Revised Code § 4112.02(A) similarly provides that it is unlawful discriminatory practice "[f]or any employer, because of the . . . age . . . of any person . . . to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly

related to employment." Ohio Rev. Code § 4112.02(A). Since age discrimination claims brought under Ohio law "are analyzed under the same standards as claims brought under the ADEA," the Court considers both of Plaintiff's age discrimination claims together. *Moffat v. Wal-Mart Stores*, 624 F. App'x 341, 345 (6th Cir. 2015) (*citing Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005)).

Once again, a plaintiff claiming age discrimination must establish a prima facie case, which can be done by showing: "(1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger worker, or there are circumstances that support an inference of discrimination." *Moffatt*, 624 F. App'x at 345–46. After a plaintiff satisfies this burden, the defendant must proffer a legitimate, nondiscriminatory reason for the adverse decision, and plaintiff must then show that the stated reason is a pretext for age discrimination. *Moffat*, 624 F. App'x at 347 (*citing Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008). The analysis for showing pretext is the same as for a disability discrimination claim. *Moffat*, 624 F. App'x at 347.

The Court presumes, without deciding this issue, that Plaintiff has established a prima facie case of age discrimination. However, the analysis for determining whether the intentional falsification of Plaintiff's timesheets was pretext for his termination is the same as the Court's previous discussion of Plaintiff's disability discrimination claim. *See supra*. Therefore, Plaintiff has failed to establish a genuine issue of material fact that Defendant's legitimate, nondiscriminatory reason was pretextual, and the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's state and federal law claims for age discrimination.

## V. Conclusion

Defendant's Motion for Summary Judgment (R. 29; R. 31-1) is GRANTED. As a result, this action is DISMISSED with prejudice.

IT IS SO ORDERED.

s/ *David A. Ruiz*

David A. Ruiz
United States District Judge

Date: September 26, 2024